UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

HENRY BROWN, SONYA MOYER, NURIA BRYANT, BERNICE BROWN, and RAYMOND DORCELA,

                      Plaintiffs,

v.

FIRE DEPARTMENT OF THE CITY OF NEW YORK, THE CITY OF NEW YORK, MARC BLUMENFRUCHT, CHAYIM KIRSCHENBAUM, IRIS HOLDINGS LLC, IRIS HOLDINGS NY LLC, IRIS HOLDINGS 161 BUFFALO LLC, BLACK IRIS LLC, SAMARITAN DAYTOP VILLAGE, INC., NATHAN SILVERMAN, ELEZI RENOVATION, INC., UNIDENTIFIED CONSTRUCTION WORKERS, and UNIDENTIFIED FIRE DEPARTMENT OFFICERS,

                      Defendants.

**MEMORANDUM AND ORDER**
19-cv-2400 (LDH)

---

L\ASHANN D\EARCY HALL, United States District Judge:

      Plaintiffs Henry Brown, Sonya Moyer, Nuria Bryant, Bernice Brown, and Raymond Dorcela bring the instant action against Defendants Marc Blumenfrucht, Chayim Kirschenbaum, Iris Holdings LLC, Iris Holdings NY LLC, Iris Holdings 161 Buffalo LLC, and Black Iris LLC (collectively, "Building Defendants"); Samaritan Daytop Village, Inc.; the City of New York and the Fire Department of the City of New York State ("FDNY") ("City Defendants"); and Unidentified Fire Department Officers (the "FDNY Officers").[1]  Plaintiffs assert claims against

---

[1] Plaintiffs also assert causes of action against Elezi Renovation, Inc. and Nathan Silverman, but failed to file proof of service of the amended complaint on the docket.  Additionally, Plaintiffs have failed to identify the Unidentified Construction Workers.  Plaintiff is ordered to show cause within fourteen (14) days of this memorandum and order as to why the case should not be dismissed against these Defendants under Fed. R. Civ. P. 4(m).  *See* Fed. R. Civ. P. 4(m) ("If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time.").

Building Defendants under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, along with various state law claims.  Plaintiffs assert claims for warrantless entry pursuant to 42 U.S.C. § 1983 against Building Defendants and the FDNY Officers.  Plaintiffs also assert a *Monell* claim against the City of New York for its alleged failure to train and supervise officers.[2]  Building Defendants and the City Defendants each move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the amended complaint in its entirety.

## BACKGROUND[3]

Plaintiffs are rent-regulated tenants of 161 Buffalo Avenue ("the Building"), a 23-unit apartment building in Brooklyn, New York.  (Am. Compl. ¶¶ 1, 11-15, ECF No. 29.)  The Building is owned and operated by Defendant Iris Holdings Group, a corporate entity directed and managed by Defendants Blumenfrucht and Kirschenbaum.[4]  (*Id.* ¶¶ 16-20.)  Plaintiffs are all African American, or in the case of Plaintiff Bryant, Afro-Costa Rican, and reside in rent-controlled or rent-regulated apartments.  (*Id.* ¶¶ 11-15.)

On February 16, 2016, Building Defendants purchased the Building from its former owner.  (*Id.* ¶ 2.)  At some point thereafter, Plaintiffs became the only remaining tenants left in the Building.  (*Id.* ¶ 3.)  After assuming ownership of the Building, Building Defendants pressured Plaintiffs to vacate their apartments.  (*Id.* ¶ 54.)  Specifically, Building Defendants made buyout offers, threatened rent increases, and threatened to refrain from making any repairs

---

[2] Plaintiffs purport to bring claims against the FDNY, a city agency.  Claims against the FDNY lie against the City of New York.  *See Jenkins v. City of N.Y.*, 478 F.3d 76, 93 n.19 (2d Cir. 2007) ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law." (quoting N.Y.C. Charter § 396)).

[3] The following facts are taken from the amended complaint and are assumed to be true for purposes of deciding the instant motion.

[4] The Iris Holdings Group is alleged to also do business as Iris Holdings LLC, Iris Holdings NY LLC, and Iris Holdings 161 Buffalo LLC.  (*See* Am. Compl. ¶¶ 18-20.)  The Iris Holdings Group is a subsidiary of Black Iris LLC, a New Jersey corporation.  (Am. Compl. ¶ 21.)  These corporate entities will hereinafter be referred to collectively as "the Iris Holdings Group."

2

on the building. (*Id.* ¶ 54-62.) Furthermore, the Building was to be leased to Defendant Samaritan Daytop Village, Inc. ("Samaritan"), a nonprofit organization that provides supportive housing for its clients, who include veterans and individuals with substance abuse issues. (*Id.* ¶ 22, 93.) Building Defendants warned Plaintiffs that after a period of construction, "this place will be rented out to homeless people, and that won't be pleasant to live with people like that, so you're going to want to move." (*Id.* ¶ 61.) These incoming supportive housing tenants, according to Plaintiffs, would be "primarily people of color… possessing handicaps."[5] (*Id.* ¶ 100.) Nevertheless, Plaintiffs remained in the Building, and Building Defendants began renovations. (*Id.* ¶ 5, 65.)

Building Defendants hired Elezi Renovation Inc. to manage the renovation project. (*Id.* ¶ 24.) According to the Complaint, the renovation did not conform to local and state health and safety requirements. (*Id.* ¶ 65.) As a result, Plaintiffs were exposed to unsafe and uninhabitable living conditions, and were denied essential services such as light, gas, electricity, access to the mail, running water, and heat. (*Id.* ¶ 5, 66, 68, 80-83.) The renovations resulted in holes in the walls and ceilings of Plaintiffs' apartments, which led to invasions of privacy, safety concerns, and humiliating events. (*Id.* ¶¶ 5, 72, 75-78.) Plaintiff Bryant, for instance, was forced to use an umbrella for privacy in her own bathroom, and Plaintiff Henry Brown had to tape a garbage bag above his shower to avoid being seen by workers in the apartment above. (*Id.* ¶ 75.) Building Defendants also did not provide restrooms for the construction workers, and so the workers relieved themselves in the hallways and vacant units of the Building. (*Id.* ¶ 66.) On April 25, 2016, urine from the vacant unit upstairs leaked through a hole in the ceiling onto Plaintiff Bryant's face while she was in bed. (*Id.* ¶ 78.)

---

[5] The complaint is silent as to what type of handicaps these individuals might possess.

Plaintiffs allege that Building Defendants' harassment was due, in part, to a basic lack of respect for Plaintiffs, "[b]ecause Plaintiffs are people of color." (*Id.* ¶ 99.) Defendant Blumenfrucht's commented that Plaintiff Henry Brown, who is African American, "look[ed] like he had money," which according to Plaintiff Henry Brown was based on racial stereotyping. (*Id.* ¶ 101.)

At some point before April 2016, Building Defendants allegedly contracted with the FDNY to allow the FDNY to conduct training exercises inside the Building while it was occupied by Plaintiffs. (*Id.* ¶¶ 32-33, 118.) The alleged agreement between Building Defendants and the FDNY was made pursuant to FDNY Regulation 22.5.7, which permits the FDNY to conduct training exercises in occupied private buildings. (*Id.* ¶ 34.) The FDNY used the Building as a practice facility over a period of approximately three months, from April to June 2016. (*Id.* ¶ 33.) The training exercises included breaking down doors and entering apartments, and led to two incidents of forcible, warrantless entry into Plaintiffs' apartments. On May 17, 2016, Plaintiff Moyer returned to her apartment to find that her door frame had been broken down and her apartment was entered without a warrant. (*Id.* ¶¶ 38-39.) Plaintiff Moyer, assuming she had been robbed, called the police to report a robbery. (*Id.* ¶ 39.) And, on May 21, 2016, Plaintiff Henry Brown returned home to find that his front door had been broken down and his home entered without a warrant. (*Id.* ¶ 41.) After the warrantless entries in his home, Plaintiff Henry Brown notified the local fire department house and community board. (*Id.* ¶ 42.)

Plaintiffs also allege that the FDNY Officers conducting exercises in the Building were not adequately trained to distinguish occupied apartments from vacant apartments, or supervised when taking actions that entailed a risk that they may enter occupied apartments. (*Id.* ¶¶ 53, 110.)

4

**STANDARD OF REVIEW**

To withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of defendants' liability for the alleged misconduct.  *Id*.  While this standard requires more than a "sheer possibility" of defendants' liability, *id*., "[i]t is not the Court's function to weigh the evidence that might be presented at trial" on a motion to dismiss. *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999).  Instead, "the Court must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the Court must accept the factual allegations of the complaint as true." *Id*. (citations omitted).

**DISCUSSION**

**I.     Claims Against Building Defendants**

    **A.     Fair Housing Act**

        1.     Hostile Housing Environment

The Fair Housing Act ("FHA") makes it unlawful "to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(b).  The Second Circuit has recently ruled that § 3604(b) covers not just the initial sale or rental of a dwelling but "conduct that . . . would constitute discrimination in the enjoyment of residence in a dwelling or in the provision of services associated with that dwelling after acquisition."  *Francis v. Kings Park Manor, Inc.*, 944 F.3d

370, 377 (2d Cir. 2019) (internal quotations omitted), *reh'g en banc granted*, 949 F.3d 67 (2d Cir. 2020). Courts in this circuit have found that a hostile housing environment claim under § 3604(b) is cognizable, and have analyzed such a claim employing a similar framework as that used to assess hostile work environment claims.[6] *See Cain v. Rambert*, No. 13-CV-5807 MKB, 2014 WL 2440596, at *4 (E.D.N.Y. May 30, 2014) (collecting cases). Consistent with that approach, a plaintiff seeking to establish a hostile housing environment claim must allege that (1) he or she was subjected to harassment that was sufficiently pervasive and severe so as to create a hostile housing environment, (2) the harassment was because of the plaintiff's membership in a protected class, and (3) the defendant(s) is responsible for the allegedly harassing conduct towards the plaintiff. *Favourite v. 55 Halley St., Inc.*, 381 F. Supp. 3d 266, 277 (S.D.N.Y. 2019) (citing *Cain*, 2014 WL 2440596, at *5). Moreover, a plaintiff must allege some nexus between the discriminatory conduct and housing. *Spavone v. Transitional Servs. of New York Supportive Hous. Program (TSI)*, 16-CV-1219 (MKB), 2016 WL 2758269, at *7 (E.D.N.Y. May 12, 2016). Building Defendants argue that Plaintiffs have failed to plausibly allege an §3604(b) claim.[7] (Mem. L. Supp. Mot. Dismiss ("Landlord-Def. Mem.") 7-8, ECF No. 38-1.) The Court agrees.

Generally, to state a claim for hostile environment, "the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the [] environment to be abusive." *Littlejohn v. City of New*

---

[6] Claims of discrimination under the FHA are evaluated under the burden-shifting framework established for Title VII discrimination claims in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973). *See Robinson v. 72 Lofts Realty*, 610 F.2d 1032, 1036-43 (applying the same burden-shifting framework used in analyzing discrimination under Title VII to FHA claims and citing Title VII cases in evaluating the sufficiency of FHA claims); *Palmer v. Fannie Mae*, 755 F. App'x. 43, 46 (2d Cir. 2018) (summary order) (applying *McDonnell Douglas* framework to sustain dismissal of FHA discrimination claim); *Boykin v. Keycorp*, 521 F.3d 202, 213 (2d Cir. 2008) (applying *McDonnell Douglas* framework to reverse dismissal of FHA discrimination claim).
[7] In making this argument, Building Defendants cite to inapposite law regarding FHA discrimination claims based on disparate treatment. (Landlord-Def. Mem. 8.) In any event, for the reasons stated below, the hostile housing environment claim fails.

6

*York*, 795 F.3d 297, 321 (2d Cir. 2015); *see also Khalil v. Farash Corp.*, 277 F. App'x 81, 84 (2d Cir. 2008) (assuming, without deciding, that a hostile housing environment claim was cognizable and requires that "that the complained of conduct . . . is objectively severe or pervasive" (quoting *Patane v. Clark,* 508 F.3d 106, 113 (2d Cir.2007))). In assessing the claim, the Court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance . . . ." *Littlejohn*, 795 F.3d at 321. (hostile work environment claim); *see also Quow v. Wallach*, No. 16 CIV. 3947 (AMD), 2016 WL 4099107, at *2 (E.D.N.Y. Aug. 2, 2016) (hostile housing environment claim).

Here, Plaintiffs allege that the Building Defendants exposed Plaintiffs to unsafe, uninhabitable, and humiliating living conditions. (Am. Compl. ¶¶ 5, 66, 68, 80-83.) For example, as a result of the ongoing renovations to the building, Plaintiff Bryant was forced to use an umbrella for privacy in her own bathroom, and Plaintiff Henry Brown had to tape a garbage bag above his shower to avoid being seen by workers in the apartment above. (*Id.* ¶ 75.) Building Defendants also did not provide restrooms for the construction workers. As a consequence, the workers relieved themselves in the hallways and vacant units of the Building. (*Id.* ¶ 66.) On April 25, 2016, urine from the vacant unit upstairs leaked through a hole in the ceiling onto Plaintiff Bryant's face while she was in bed. (*Id.* ¶ 78.) Furthermore, Building Defendants denied Plaintiffs essential services such as light, gas, electricity, access to the mail, running water, and heat. (*Id.* ¶ 5, 66, 68, 80-83.) This behavior easily satisfies the requirement that the complained-of conduct be sufficiently severe under both the subjective and objective prong.

That said, Plaintiffs' claim for hostile housing environment fails because they cannot show that the challenged conduct occurred because of a protected characteristic. Discriminatory motive is an element of any § 3604 discrimination claim. *See Haber v. ASN 50th St. LLC*, 847 F. Supp. 2d 578, 586 (S.D.N.Y. 2012) (articulating on deciding a motion for summary judgment that "[b]ecause §§ 3604 and 3617 prohibit a wide range of conduct, courts in this Circuit have articulated the elements of a prima facie showing in differing ways depending on the conduct at issue. But regardless of how the prima facie standard is articulated, the plaintiff is required to show that defendants' action against him arose from a discriminatory motive." (internal citations omitted)). To survive a motion to dismiss, a plaintiff must satisfy "a *minimal* burden of showing facts suggesting an inference of discriminatory motivation." *Palmer*, 755 F. App'x. at 45 (internal quotation marks omitted and emphasis in original) (quoting *Littlejohn*, 795 F.3d at 311); *De La Pena v. Metro. Life Ins. Co.*, 953 F. Supp. 2d 393, 417 (E.D.N.Y. 2013) ("Although it has been held that the incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination occurred, a plaintiff must still establish that the circumstances in which the incidents occurred can reasonably be interpreted as having taken place on the basis of that trait or condition." (internal citations and modifications omitted)), *aff'd*, 552 F. App'x 98 (2d Cir. 2014). None of Plaintiffs' allegations supports an inference of discriminatory motivation.

To start, Plaintiffs allege that Building Defendants' "degrading, inhumane, and humiliating treatment… was due, in whole or in part, to the Plaintiffs' race or ethnicity," and that Building Defendants "created a hostile environment by which they have interfered with Plaintiffs' quiet enjoyment of their homes, on the basis of their race, color, and national origin." (Am. Compl. ¶¶ 99, 126.) However, these sorts of conclusory allegations are insufficient to

8

adequately plead an inference of discriminatory motivation. *See, e.g. Palmer*, 755 F. App'x at 46 (dismissing plaintiff's FHA housing discrimination complaint because it "merely raise[d] conclusory allegations that Fannie Mae discriminated against her, a pregnant woman," but fail[ed] to offer any facts to support such allegations (internal quotations omitted)); *Logan v. Matveevskii*, 175 F. Supp. 3d 209, 226-27 (S.D.N.Y. 2016) (dismissing pro se plaintiff's race-based FHA discrimination claim, where no inference of discriminatory motivation could be drawn from conclusory allegations of "discrimination against a black family").

Plaintiffs do plead two specific allegations that they argue evince discriminatory animus. Both are problematic for Plaintiffs. *First,* Plaintiffs argue that the Building Defendants' repeated attempts to encourage Plaintiffs to leave their apartments by warning them that "this place will be rented out to homeless people, and that won't be pleasant to live with people like that, so you're going to want to move" evinces a discriminatory motive. (Mem. L. Opp. Mot. Dismiss ("Pls.' Opp.") 8, ECF No. 41; Am. Compl. ¶¶ 61, 100.) By the plain language of the statute, homeless individuals are not included in the class of persons afforded protection under the FHA. *See Anderson v. Herbert*, No. 2:13-CV-211, 2014 WL 6769907, at *4 (D. Utah Dec. 1, 2014) (holding same). Nevertheless, Plaintiffs advance two arguments with respect to this comment. According to Plaintiffs, the alleged homeless individuals, who would be moving into supportive housing units in the building, would "likely be people of color," and therefore Defendants' comment that it would be unpleasant to live with those tenants evinces a discriminatory motive against African Americans. (Pls.' Opp. 8.) To agree with Plaintiffs' argument would require the Court to agree that a reference to homeless individuals is synonymous with African American people. This is a logical leap the Court is not willing to make. Plaintiffs further argue that as "many supportive housing tenants struggle with drug addiction, they likely fall within the

9

definition of handicapped under the FHA." (*Id.*)  This argument likewise requires an inference that the Court declines to make as Plaintiffs offered no specific allegations that the future supportive housing tenants suffered from drug addiction.  Moreover, Plaintiffs complain of discrimination on account of their "race, color and national origin," (Am. Compl. ¶ 124), not any disability status, so any comments regarding individuals with disabilities is irrelevant for the purposes of discerning whether there is a plausible claim of discriminatory motive.  In short, Plaintiff's arguments as to whether the statement about the homeless individuals supports a finding of discriminatory motive are logically flawed and do not withstand scrutiny on a motion to dismiss.

*Second,* Plaintiffs contend that Defendant Blumenfrucht's statement that Plaintiff Henry Brown, who is African American, "look[ed] like he had money" was based on racial stereotyping, and thus evinces Building Defendants' discriminatory motive.  (Pls.' Opp. 8; Am. Compl. ¶ 101.)  Plaintiffs' argument is muddled at best.  Indeed, it is unclear how this comment relates in any way to any racial stereotype about African Americans.  Even if the Court were to determine that the comment could be construed as a racial stereotype, the comment alone is not sufficient to sustain a finding of discriminatory motivation.  For example, in *De La Peña v. Metro. Life Ins. Co.*, the court found that a statement made to a Filipino employee, stereotyping Filipinos as "heavy beer drinkers,"—while "offensive" to the [p]laintiff—did not support a plausible inference that the plaintiff was "targeted . . . because of his race." *De La Pena*, 953 F. Supp. 2d at 418 (dismissing hostile work environment claim because the plaintiff failed to plead a causal connection between his protected status and the alleged hostile work environment).  Accordingly, there, the plaintiff's hostile work environment claim failed. *Id.*  So too here with respect to Plaintiffs' hostile housing environment claim.

10

2. Blockbusting

Section 3604(e) of the FHA makes it unlawful, "[f]or profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. § 3604(e). The Supreme Court has explained that blockbusting is the practice—often by real estate brokers—of "exploiting fears of racial change by directly perpetuating rumors and soliciting sales in target neighborhoods." *Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 110 n.23 (1979). Relying on the same arguments raised with respect to the hostile housing environment claim, Plaintiffs contend that Landlord-Defendant's reference to homeless people brings Building Defendants into the ambit of § 3604(e). (Pls.' Opp. 8-9.) Again, the Court disagrees.

Section § 3604(e) defines protected classes as "race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. § 3604(e). As with their hostile housing environment claim, Plaintiffs invite the Court to find that homeless individuals, or those who avail themselves of supportive housing, are synonymous with people of color or substance abusers. (Pl.'s Opp. 9.) As explained above, that the Court will not do so. Accordingly, having failed to allege that the Building Defendants made representations regarding the entry or prospective entry into the neighborhood of a person or persons in any protected class, Plaintiffs' blockbusting claim fails.[8]

---

[8] Furthermore, for the Court to sustain a blockbusting claim, the Court would be required to extend § 3604(e) to attempts by landlords to induce tenants to vacate rent-regulated or rent-controlled apartments. Plaintiffs have cited no authority to support their argument that this is proper. The only district court found to have contemplated an analogous set of facts as here, examined, on a motion for summary judgment, whether § 3604(e) applies to attempts by landlords to induce tenants to vacate rent-regulated apartments for profit where tenants were not in a position to sell or rent apartment units they themselves rent. *Martinez v. Optimus Props., LLC*, No. 2:17-cv-03581-SVW-MRW, 2018 WL 6039875, at *15 (C.D. Cal. June 6, 2018). There, the court found that "acts made by a building's owner or landlord are not the target of [§ 3604(e)] which governs unlawful blockbusting practices directed to building owners and landlords." *Id.* In any event, the Court need not reach the issue of whether § 3604(e) could

11

B.     § 1983 Claims

A viable § 1983 claim requires a plaintiff to allege, among other things, that "the challenged conduct was attributable at least in part to a person who was acting under color of state law." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999). A private entity acts under color of state law when:

> "(1) the entity acts pursuant to the coercive power of the state or is controlled by the state ('the compulsion test'); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity has been delegated a public function by the state, ('the public function test')."

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (per curiam) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001)) (internal quotation marks and brackets omitted). The joint action test, relevant here, requires that the private entity and the state "share some common goal to violate the plaintiff's rights." *Betts v. Shearman*, 751 F.3d 78, 85 (2d Cir. 2014). "Joint action may be shown through a 'plan, prearrangement, conspiracy, custom, or policy' such that the state or its agents do not exercise judgment independent of the non-state actor." *Kohlhausen v. SUNY Rockland Cmty. Coll.*, No. 10-CV-3168, 2011 WL 2749560, at *6 (S.D.N.Y. July 13, 2011) (quoting *Ginsberg v. Healey Car & Truck Leasing, Inc.,* 189 F.3d 268, 272 (2d Cir.1999)). Building Defendants argue that Plaintiffs' § 1983 claim fails, because they have not sufficiently alleged that Building Defendants acted jointly with the City Defendants to violate Plaintiffs' constitutional rights. (Landlord-Def. Mem. 6-7.) The Court agrees.

Here, Plaintiffs complain that "[Building Defendants] jointly engaged with Defendants

---

apply to the conduct complained of by the landlords vis-à-vis their rent-regulated or rent-controlled tenants, as the claim fails on other grounds.

FDNY, the City of New York and Unidentified Fire Department Officers in the activities that lead [sic] to the violations of Plaintiffs' constitutional rights." (Am. Compl. ¶ 117.) However, the alleged joint engagement is supported only by the allegation that the Building Defendants contracted with the FDNY and the City of New York to use the Building as a practice facility from April to June 2016. (*Id.* ¶¶ 32-33, 46, 118.) This allegation is simply not enough. Plaintiff has offered no specific allegations to support an inference that Landlord-Defendant "shared a common goal to violate the plaintiff's rights." *Betts*, 751 F.3d at 85. Again, all that Plaintiffs allege is that there was a contract between the FDNY and the Building Defendants to use the building as a training site, in accordance with FDNY regulations. (Am. Compl. ¶¶ 33-34.) While Plaintiffs allege that the contract between the Building Defendants and the FDNY resulted in unlawful warrantless entries into tenants' apartments, (*id.* ¶¶ 103-07), there are no allegations that such unconstitutional behavior was required by, contemplated, or the natural consequence of the contract.[9]

Moreover, setting aside the alleged contract, there is no alleged conduct that could plausibly support a finding a joint action. It is instructive to look at examples where state action has been attributed to a private actor under the joint action test. For example, in *Bang v. Utopia Restaurant*, the plaintiff brought a § 1983 action against a private restaurant owner and police officers for false arrest, among other crimes. 923 F. Supp. 46, 49 (S.D.N.Y. 1996). There, a restaurant owner called the police. *Id.* When the police arrived, they spoke to the restaurant owner for 20 minutes and then arrested the plaintiff. *Id.* The Court inferred joint action between

---

[9] At most, Plaintiffs allegations suggest that the Building Defendants were negligent in entering into the contract, because they did not identify for the FDNY which apartments were still occupied, leading the warrantless entries. (Am. Compl. ¶¶ 32-35, 37.) However, there is no cause of action for negligence under § 1983. 42 U.S.C. § 1983; *see also Hendricks v. Coughlin*, 942 F.2d 109, 113 (2d Cir. 1991) ("Proof of mere negligence will not give rise to a constitutional violation.").

the restaurant owner due to the 20 minute conversation and the timing of the arrest. *Id.* In *Turner v. Procopio*, the court found that a private medical provider, in carrying out a search on behalf of law enforcement, was a state actor under the joint action test for the purposes of an unlawful search claim. No. 13-CV-693-FPG-MJR, 2016 WL 11483436, at *5 (W.D.N.Y. Nov. 9, 2016), *report and recommendation adopted*, 2016 WL 7186488, at *5-*6 (W.D.N.Y. Dec. 12, 2016). There, a medical provider was given a search warrant for a body search of the plaintiff. *Id.* On behalf of law enforcement, the medical provider conducted the search, which included a manual search of the plaintiff's vaginal and anal areas for contraband. *Id.* Law enforcement remained by the plaintiff's side the entire time. *Id.*

This case is clearly distinguishable. In *Bang,* the court looked to the timeline of events—*i.e.* private restaurateur called the police, spoke to police for 20 minutes, and the plaintiff was arrested shortly after—to find joint action. In *Turner,* the court looked to the physical presence of law enforcement in the room while the medical provider searched the plaintiff pursuant to a search warrant. Here, there is only the contract. Plaintiffs do not allege, for example, that the FDNY unlawfully entered Plaintiffs' apartments immediately after a conversation with Building Defendants or that Building Defendants were present during any of the FDNY exercises. Like with most claims, "a merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity." *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002). Accordingly, Plaintiffs § 1983 claim against the Landlord-Defendant fails.[10]

---

[10] Plaintiff's § 1983 allegations against Building Defendants is pleaded as a cause of action under the joint action test. (Am. Compl. ¶ 115-121.) Nevertheless, in argument, Plaintiff maintains that the allegations that Defendants contracted with FDNY "in order to force the Plaintiff's out of the building" support an inference that Building Defendants conspired with City Defendants to deliberately violate Plaintiffs' constitutional rights. (Pl.'s Opp. 6.) Even if Plaintiff had pleaded a cause of action for § 1983 conspiracy, such a claim would fail as the allegations are conclusory. *See Jae Soog Lee v. Law Office of Kim & Bae, PC*, 530 F. App'x 9, 10 (2d Cir. 2013) (summary order) ("Absent from . . . [the] complaint are allegations, made in a non-conclusory way, setting out the overt acts, and the

14

## II. Claims against the City of New York and FDNY Officers

### A. FDNY Officers

In their amended complaint, Plaintiffs added a § 1983 claim against the FDNY Officers. (*Compare* Compl., ECF No. 1 (listing Unidentified Fire Department Officers in case caption, but failing to bring a claim against them) *with* Am. Compl. (bringing § 1983 claim for warrantless entry against FDNY Officers).) City Defendants contend that because the FDNY Officers are still unnamed, claims against them are barred by the three-year statute of limitations. (Mem. L. Supp. Mot. Dismiss ("City-Defs.' Mem") 4, ECF No. 39-1.) Plaintiffs do not address City Defendants' substantive argument—which deals with the relation-back doctrine under Federal Rule of Civil Procedure 15(c)(1)—but merely state that City Defendants lack standing to assert a statute of limitations defense on behalf of the unidentified and unrepresented Officers. (Pls.' Opp. 10.) Plaintiff is wrong. "[D]istrict courts may dismiss an action *sua sponte* on limitations grounds… where 'the facts supporting the statute of limitations defense are set forth in the papers [a] plaintiff himself submitted.'" *Walters v. Indus. & Commercial Bank of China*, 651 F.3d 280, 293 (2d Cir. 2011) (quoting *Leonhard v. United States*, 633 F.2d 599, 609 n.11 (2d Cir. 1980)), *cert. denied*, 451 U.S. 908 (1981)); *accord Reches v. Morgan Stanley & Co.*, 687 F. App'x 49, 51 (2d Cir. 2017) (summary order) (holding that district court did not err in dismissing plaintiff's claim *sua sponte* as time-barred, where "all of the operative facts [for dismissal] were set forth in the [c]omplaint."). For this reason, the claim is ripe for dismissal.[11]

---

agreement, that allegedly comprised the conspiracy."). Furthermore, allegations that Building Defendants were motivated to conspire with FDNY cannot, without more, sustain a § 1983 conspiracy claim. *See Rosario v. City of N.Y.*, No. 18 CIV. 4023, 2019 WL 4450685, at *7 (S.D.N.Y. Sep. 16, 2019) (finding that plaintiff failed to sufficiently plead a § 1983 conspiracy claim where he alleged that defendant was "motivated to conspire").

[11] The Court agrees with Defendants that claims against the FDNY John Doe Officers would fail under Federal Rule of Civil Procedure 15(c)(1)(A) and (c)(1)(C). (*See* City-Defs.' Mem. 5); *see also Cotto v. City of New York*, No. 17-2845, 2020 WL 1228765, at *2 (2d Cir. Mar. 13, 2020) (summary order) (affirming dismissal of plaintiff's claims against police officer who was named as John Doe in initial complaint and identified by name after the statute of limitations period had already run pursuant to Rule 15(c)(1)(A) and (c)(1)(C)).

15

However, while the Court may dismiss sua sponte on statute of limitations grounds, the Court dismisses the claims against the FDNY Officers for another reason.  Plaintiffs failed to respond to City Defendants' substantive arguments regarding the expiration of the statute of limitations, and therefore the Court deems the claims against the FDNY Officers abandoned.  *See Colbert v. Rio Tinto PLC*, 824 F. App'x 5, 11 (2d Cir. 2020) (summary order) ("As a general matter, district courts frequently deem claims abandoned when counseled plaintiffs fail to provide arguments in opposition at the motion to dismiss stage."); *see also Belfon v. Credit Check Total Consumerinfo.com, Inc*., 18-CV-00408 (ADS) (SIL), 2018 WL 4778906, at *8 (E.D.N.Y. Oct. 1, 2018) (collecting cases).

### B. Monell Claim

Plaintiffs "need not sue the individual tortfeasors," in order to "proceed solely against the municipality" under *Monell*.  *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013).  To state a *Monell* claim against a municipality, a plaintiff must plead "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983).  Here, Plaintiffs premise their *Monell* claim on City Defendants alleged failure to train and supervise FDNY Officials conducting training exercises in occupied buildings. (*See* Am. Compl. ¶ 53.)  "The failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact."  *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007).  City Defendants argues that Plaintiffs have failed to plead facts indicating that the alleged inadequate training amounted to deliberate indifference. (City-Def. Mem. 8-9.) Here again, the Court agrees.

16

A finding that a municipality's failure to train or supervise constitutes deliberate indifference requires a plaintiff to show that: (1) a policymaker knows to a moral certainty that her employees will confront a given situation; (2) the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and (3) the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights. *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007). The Supreme Court has cautioned that deliberate indifference is a "stringent standard of fault." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Furthermore, "without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* at 62.

Here, Plaintiffs allege that City Defendants failed to train FDNY officers how to "properly distinguish occupied from vacant apartments in the context of emergency entry training exercises." (Am. Compl. ¶¶ 53, 113.) The complaint contains two allegations of constitutional violations: the warrantless entries by FDNY Officers into Plaintiff Moyer's apartment on May 17, 2016, and Plaintiff Henry Brown's apartment on May 21, 2016.[12] (Am. Compl. ¶¶ 38, 41.) However, there are no allegations that indicate that City Defendants were on notice that the training of FDNY officers was deficient. Plaintiff Moyer did call the police after the FDNY allegedly entered her home because she thought they had been robbed. (Am. Compl. ¶ 39.) However, there is no plausible inference that her call to the police to report a robbery put

---

[12] There is an additional allegation of an encounter between Plaintiff Bryant and FDNY Officers in her doorway. Specifically, Plaintiffs allege that on April 30, 2016, Plaintiff Bryant was awoken by loud noises, including a banging noise. (Am. Compl. ¶ 36.) Plaintiff Bryant went to her door and "saw several FDNY officers in her doorway." (*Id.*) There is no allegation of warrantless entry into her apartment. Accordingly, any complaints that she made to the local fire department and her local community board, (Am. Compl. ¶ 43), would not have put City Defendants on notice of any failure to train or supervise.

17

the City Defendants on notice that the training of FDNY officers was deficient. Plaintiff Henry Brown filed a complaint at the local fire house and complained to Brooklyn Community Board #8 after the alleged unlawful entrance into his home. (*Id.* ¶ 42.) However, any such complaints, which were made after the alleged warrantless entries into Plaintiffs' homes, could not be said to have put the City Defendants on notice of training deficiencies prior to the alleged unconstitutional conduct.

Furthermore, a pattern of similar constitutional violations by untrained employees is generally necessary to demonstrate deliberate indifference.[13] *Connick*, 563 U.S. at 61-62. "A training program is not inadequate merely because a few of its graduates deviate from what they were taught." *Jenkins*, 478 F.3d at 95. And while there is no "magic number" of instances of unconstitutional conduct that will suffice to permit the inference of a pattern, courts in the Second Circuit have found that two incidents did not support an inference of a policy or custom under *Monell*. *Norton v. Town of Islip*, 12-CV-4463, 2016 WL 264930, at *7 (E.D.N.Y. Jan. 21, 2016) (collecting cases), *aff'd*, 678 F. App'x 17 (2d Cir. 2017). The two instances of warrantless entry here do not make a pattern.

\*   \*   \*

Having dismissed all of the federal claims in this action, the Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3) over Plaintiff's state law claims. *See Brzak v. United Nations*, 597 F.3d 107, 113–14 (2d Cir. 2010) ("We have said that if a plaintiff's federal claims are dismissed before trial, the state claims should be dismissed as well." (internal quotations omitted)); *see also First Capital Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d

---

[13] The Supreme Court explained in *Connick* that there is a "narrow range of circumstances," none of which are applicable here, where a pattern of similar violations might not be necessary to show deliberate indifference. *Connick v. Thompson*, 563 U.S. 51, 63 (2011).

159, 182 (2d Cir. 2004) ("The exercise of supplemental jurisdiction is left to the discretion of the district court[.]"). These claims are therefore dismissed without prejudice for lack of subject-matter jurisdiction.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss for failure to state a claim are GRANTED.

SO ORDERED.

Dated: Brooklyn, New York  /s/ LDH
      November 25, 2020  L$_A$SHANN D$_E$ARCY HALL
                                        United States District Judge